IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DIVISION

MAQUOKETA MUNICIPAL
ELECTRIC UTILITY,

      Plaintiff,

vs.

GENERAC POWER SYSTEMS,
INC., a Wisconsin corporation,

      Defendant.

No. C09-1049

RULING ON MOTIONS FOR
SUMMARY JUDGMENT

_____

## TABLE OF CONTENTS

I.     INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.    PROCEDURAL HISTORY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

III.   ISSUES PRESENTED. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

IV.   RELEVANT FACTS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
     A.   The Parties. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
     B.   Distribution of Electricity. . . . . . . . . . . . . . . . . . . . . . 3
     C.   Generators Added. . . . . . . . . . . . . . . . . . . . . . . . . . . 4
     D.   Problems Develop. . . . . . . . . . . . . . . . . . . . . . . . . . . 6
     E.   Expectations of the Parties. . . . . . . . . . . . . . . . . . . . . 7

V.    LEGAL STANDARD FOR SUMMARY JUDGMENT. . . . . . . . . . . . . . . 9

VI.   DISCUSSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
     A.   Breach of Contract. . . . . . . . . . . . . . . . . . . . . . . . . . 10
     B.   Breach of Express Warranty. . . . . . . . . . . . . . . . . . . . . . 13
     C.   Breach of an Implied Warranty of Fitness for a
        Particular Purpose. . . . . . . . . . . . . . . . . . . . . . . . . . 16
     D.   Breach of Limited Warranty. . . . . . . . . . . . . . . . . . . . . . 20

VII.  SUMMARY. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

VIII. ORDER. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

## I. INTRODUCTION

On the 7th day of February, 2011, this matter came on for hearing on the Motion for Summary Judgment (docket number 30) filed by the Plaintiff, Maquoketa Municipal Electric Utility ("MMEU"), on December 10, 2010; and the Motion for Summary Judgment (docket number 31) filed by the Defendant, Generac Power Systems, Inc. ("Generac"), on the same date. MMEU was represented by its attorney, Steven J. Kahler. Generac was represented by its attorneys, Christopher P. Banaszak and Roddy W. Rogahn.

## II. PROCEDURAL HISTORY

This case was initiated on September 16, 2009, with the filing of a petition at law in the Iowa District Court for Jackson County. The action arises from the purchase by MMEU of four generators manufactured by Generac. MMEU seeks judgment against Generac for breach of contract, breach of express warranty, breach of implied warranty, and breach of limited warranty. On November 6, 2009, the action was removed to the United States District Court for the Northern District of Iowa.

On December 30, 2009, Generac filed an answer denying many of the material allegations, and asserting certain affirmative defenses. In addition, Generac asserted a counterclaim, alleging breach of express warranty and unjust enrichment. MMEU answered the counterclaim on February 4, 2010, denying the material allegations, and asserting affirmative defenses.

On February 4, 2010, the Court adopted a proposed Scheduling Order and Discovery Plan submitted by the parties. Among other things, the Court established a November 4, 2010 deadline for filing dispositive motions. The dispositive motions deadline was subsequently extended to December 10, 2010. On that date, the parties filed their instant motions for summary judgment. This case is scheduled for trial to the Court on March 14, 2011.[1]

---

[1] On February 4, 2010, the case was referred to the undersigned magistrate judge (continued...)

### III. ISSUES PRESENTED

In its motion for summary judgment, MMEU asks that the Court award summary judgment in its favor on the "non-damage/liability elements" of its claim for breach of implied warranty. In its motion for summary judgment, Generac asks that the Court summarily dismiss all four of MMEU's claims. MMEU does not claim that it is entitled to summary relief on its other three claims, nor does Generac claim that it is entitled to summary relief on its counterclaim.

### IV. RELEVANT FACTS

#### A. The Parties

MMEU is a municipal electric utility organized and existing under the laws of the State of Iowa. Its principal place of business is located in Maquoketa, Iowa. MMEU buys power from Wisconsin Public Power Inc. ("WPPI") and then sells it to its local customers. Prior to January 1, 2009, MMEU contracted to buy power from Resale Power Group of Iowa ("RPGI"). MMEU has also had its own power generating equipment since 1986.

Generac is a corporation organized and existing under the laws of the State of Wisconsin, with its principal place of business in Waukesha, Wisconsin. Generac owned and operated a plant in Maquoketa, Iowa, at which it manufactured generators, until the plant closed in 2009.

#### B. Distribution of Electricity

MMEU, RPGI, and WPPI are part of the Midwest Systems Operations ("MISO"). MISO controls the provision of electricity to an eight or nine-state region. To ensure that all electricity demands across its region are met, MISO is responsible for determining which supplier is responsible for providing certain quantities of electricity during certain periods of time. MISO then calls upon a supplier, such as RPGI, to provide a certain

---

[1](...continued)
for the conduct of all further proceedings, pursuant to 28 U.S.C. § 636(c) and the consent of the parties.

output of electricity on a certain date over a designated period of time. Based on RPGI's operational instructions from MISO, RPGI is then responsible for determining the level and length of output required from each of its members, such as MMEU, in order for it to comply with the instructions from MISO. RPGI then calls upon its members, such as MMEU, and informs the member that it is required to run its generators at a certain output on a certain date for a certain length of time.

RPGI is a "loosely held organization of primarily municipal utilities" that buys electricity at wholesale and resells it to the end customer at retail. RPGI and its members, such as MMEU, enter into a contract annually regarding the electrical capacity which the member has agreed to provide that year. Under the agreement, MMEU committed 30,250 kW capacity to RPGI, which it could be called upon to provide at any time during the year. MMEU received a monthly "capacity payment" from RPGI based on the number of kilowatts it committed to RPGI under the agreement. To determine and verify its capacity to deliver the amount of kilowatts committed to RPGI under the agreement, MMEU was required to conduct an annual "URGE test." The test required MMEU employees to program the generators, turn them on, and run them for two hours at the rate required under the RPGI contract.

On January 1, 2009, MMEU started purchasing its electricity under a similar contract with WPPI. Pursuant to that agreement, MMEU receives capacity payments from WPPI when it is not required to run its generators. When MMEU is called upon to run its generators, it receives the capacity payment and WPPI also pays MMEU for the cost of fuel and a maintenance fee. MMEU is also able to sell in the marketplace any excess capacity of electricity it generates.

### C. Generators Added

In the late 1990s and early 2000s, many municipal utilities were adding generators for "Peaking Generation." In late 1999 or early 2000, Louie R. Ervin, a professional engineer, was hired by MMEU as a consultant to assist in the acquisition of additional

generators by MMEU. On or about September 27, 2000, MMEU issued a Request for Proposal (the "2000 RFP"), in which it solicited bids for "[t]wo 2,000 kW Standby Engine-Generators, Enclosures, Auxiliary Equipment, Switchgear and Controls." The 2000 RFP was prepared by Louie Ervin.

The 2000 RFP was sent out for bids in September of 2000. There were three or four bids submitted. Ervin tabulated the bids. The bids were opened in a public meeting. All of the bidders were present, as were the MMEU Board of Trustees and MMEU staff. The discussion ended with the MMEU Board's selection of the bid presented by ComEd, the non-utility affiliate of Commonwealth Edison, which was bidding Generac units. MMEU wanted to select the bid utilizing Generac generators in order to support a local factory that was moving to Maquoketa.

On November 28, 2000, MMEU and ComEd entered into a "design/build" agreement for the two generators described in the 2000 RFP. The agreement provided that equipment or material not manufactured by ComEd – specifically including the engine, generator, and switchgear – "shall be warranted by the manufacturer" for seven years or "such greater period as contained in the warranty provided to ComEd by manufacturers of such equipment and materials." The agreement further provided that at MMEU's request, ComEd would assign to MMEU "any and all manufacturer's and installer's warranties for equipment or material not manufactured by ComEd." The two generators – designated by MMEU as units 11 and 12 – went into operation on July 19, 2001.

On July 23, 2001, MMEU issued a second Request for Proposal (the "2001 RFP"), soliciting bids for "[t]wo 1,800 kW Standby Engine-Generators, Enclosures, Auxiliary Equipment, Switchgear and Controls." The 2001 RFP noted that MMEU "has two 1,800 KW Generac SD2000 standby generators" and stated that "[t]his RFP is for two additional KW Generac SD2000 standby rated engine-generator sets." The same bidding process was followed for the 2001 RFP. The contract was awarded to Tri-City Electric, whose bid included two Generac SD2000 standby generators.

On September 18, 2001, MMEU and Tri-City Electric entered into a contract for the installation of the two additional generators. The "bid clarification" included by Tri-City Electric in its bid form stated that "[t]he extended warranty for the engines, generators, and auxiliary equipment is for seven years. Generac does not offer a ten year warranty." The two additional generators – designated by MMEU as units 13 and 14 – went into operation on April 17, 2002. Each of four generators installed pursuant to the ComEd and Tri-City Electric contracts was an SD2000, manufactured by Generac.

## D. Problems Develop

It is undisputed that the four Generac units were operating properly after Generac's technicians completed their installation. Over time, however, MMEU began to experience problems with the generators. On two different occasions in 2005, unit 13 failed due to "scoring of the pistons and scuffing of the cylinders" in the engine. In 2006, one of the generators experienced "a fire in the turbo."

The engines for the four generators were manufactured by Mitsubishi Heavy Industries ("MHI"). In November of 2006, MHI and Mitsubishi Engines North America ("MENA") sent representatives to the MMEU plant in Maquoketa to inspect all four units. MHI issued an "Investigation Report" regarding the fire in unit 13, and on December 22, 2006, MENA sent a letter to Generac regarding its findings and recommendations.

MENA identified two possible causes for the cylinder scuffing: "a) excessive heat load generated by continuous long hours [of] operation at high-output, probably 90% of rated point; and b) defects of injection nozzles." MENA recommended that the "service load [on the four generators] should be less than 80% (1600kWe), and the above operating load condition should be less than 25 hrs/year. Also, average load should be less than 60% of rated output (1200kWe)." MMEU has reduced its use of the Generac generators in compliance with MENA's recommendations.

### E. *Expectations of the Parties*

MMEU argues that Generac was "fully aware of the manner in which MMEU intended to run the generators."[2] According to MMEU, the term "standby" – as used in the RFPs – had a recognized meaning within the industry at that time, which would allow the generators to be run at their maximum rating for up to 200 hours per year. MMEU asserts that its "representatives expressly informed representatives from Generac that MMEU intended to operate the Generac Units on a flat base load or constant load at or near the prime power load for several hours per day in order to comply with its obligations under the RPGI contract."[3] In support of its claims, MMEU cites deposition testimony by Doug Owen and Larry Huston, a project manager hired by MMEU to coordinate the completion of the installation of the first set of Generac units and to oversee the installation of the second set of Generac units. Owen testified regarding conversations he had with Louie Ervin, a consultant hired by MMEU, and Don Vanderbrook, the project engineer for Generac. According to Owen, Generac "knew all about RPGI" and he could remember Vanderbrook "talking about how -- you know, based on what RPGI wants and needs, these would fit the bill."[4]

> Yeah, Don and I and Louie were in the council chambers when we discussed that, because that was one of our concerns I think, was to make sure that we would be able to comply with RPGI in all the -- you know, their requests and things, and Louie's --

*See* Deposition of Doug Owen, 76:14-20 (MMEU's Appendix at 104).

In his deposition, Huston testified that he dealt primarily with Vanderbrook and Joel Dewall, a service manager in Generac's member service/warranty group. According to

---

[2] *See* MMEU's Brief in Support of Motion for Summary Judgment (docket number 30-1) at 7.

[3] *Id.*

[4] *See* MMEU's Appendix at 102-103.

Huston, Dewall was there to "bless off on the installation." Huston opined that "as far as the operation, they were fully aware of how the unit was intended to be run."[5] However, Huston was unable to provide specific information regarding the basis for his understanding.

> Q.  The -- did you have any discussions with Joel DeWall about what level MMEU would be running the units at and for what periods of time?
>
> A.  No. Not that even comes to mind as far as to say, you know, that, no.
>
> Q.  Did you have any discussions or communications with anyone else from Generac other than Joel about what level the MMEU would be operating units at and for what periods of time?
>
> A.  I have -- I didn't have that portion as far as -- mine was more on the installation and that. And I -- you know, just from my observation and curiosity, from just the past, but -- like I say, the one thing that is clear in my mind is that there was never a doubt that the guys that were there did not have a clear understanding of the application and the installation.

*See* Deposition of Larry Ray Huston, 50:12-51:3 (MMEU's Appendix at 208). When asked later in his deposition by MMEU's attorney whether Vanderbrook and Dewall "were fully aware of how the units were intended to be run," Huston responded that "I guess if you want to say an assumption or whatever, that they understood, yes. That was my impression, that they understood --"[6]

---

[5] *See* MMEU's Appendix at 207.

[6] *See* MMEU's Appendix at 214.

## V. LEGAL STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate if the moving party shows that "there is no genuine dispute as to any material fact and the movant is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(a).[7] A genuine dispute as to a material fact "'exists if a reasonable jury could return a verdict for the party opposing the motion.'" *Anderson v. Durham D & M, L.L.C.*, 606 F.3d 513, 518 (8th Cir. 2010) (quoting *Humphries v. Pulaski County Special School District*, 580 F.3d 688, 692 (8th Cir. 2009)). A fact is a "material fact" when it "might affect the outcome of the suit under the governing law. . . ." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In order to establish the existence of a genuine dispute as to a material fact, the non-moving party "'may not merely point to unsupported self-serving allegations.'" *Anda v. Wickes Furniture Co.*, 517 F.3d 526, 531 (8th Cir. 2008) (quoting *Bass v. SBC Communications, Inc.*, 418 F.3d 870, 872 (8th Cir. 2005)). Instead, the non-moving party "'must substantiate [its] allegations with sufficient probative evidence that would permit a finding in [its] favor.'" *Anda*, 517 F.3d at 531 (quoting *Bass*, 418 F.3d at 873); *see also Anderson*, 477 U.S. at 248 (A nonmoving party must offer proof "such that a reasonable jury could return a verdict for the nonmoving party."). "'Evidence, not contentions, avoids summary judgment.'" *Reasonover v. St. Louis County, Mo.*, 447 F.3d 569, 578 (8th Cir. 2006) (quoting *Mayer v. Nextel W. Corp.*, 318 F.3d 803, 809 (8th Cir. 2003)). The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences. *Baer Gallery, Inc. v. Citizen's Scholarship Foundation of America, Inc.*, 450 F.3d 816, 820 (8th Cir. 2006) (citing *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006)).

---

[7] An amended version of FEDERAL RULE OF CIVIL PROCEDURE 56 became effective on December 1, 2010. However, "[t]he standard for granting summary judgment remains unchanged." FED. R. CIV. P. 56 advisory committee's note.

## VI. DISCUSSION

In its petition, MMEU asserts four claims: Breach of contract, breach of express warranty, breach of implied warranty of fitness for a particular purpose, and breach of limited warranty. MMEU asks that it be awarded summary judgment on the liability portion of its third claim for relief – breach of an implied warranty of fitness for a particular purpose. Generac asks that all four claims be summarily dismissed. The Court will address each of the claims in order.

### A. Breach of Contract

First, MMEU asserts that the four units supplied by Generac breached Generac's contracts with ComEd and Tri-City Electric.[8] Specifically, MMEU argues that the generators provided by Generac failed to conform with MMEU's requests for proposals and, thus, failed to comply with the contracts.[9]

The 2000 RFP called for "[t]wo 2,000 KW standby rated engine-generator sets." The successful bid included the SD2000 manufactured by Generac. The 2001 RFP noted that "MMEU currently has two 1,800 KW Generac SD2000 standby generators," and

---

[8] For reasons which are not entirely clear to the Court, rather than suing ComEd and Tri-City Electric on its contracts with those companies, MMEU elected to sue Generac, asserting that MMEU is a third-party beneficiary of Generac's contracts with ComEd and Tri-City Electric. In its answer, Generac denied that MMEU is a third-party beneficiary of the contracts. Generac did not raise that issue in its motion for summary judgment, however, and at the time of hearing Generac's counsel conceded that MMEU may properly assert a breach of Generac's contracts with ComEd and Tri-City Electric.

[9] The Court has not been provided with copies of the contracts which were allegedly breached. That is, Generac's contracts with ComEd and Tri-City Electric were not attached to the petition, nor were they included in the voluminous documents produced in association with the motions for summary judgment. At the time of hearing, however, the parties agreed that it was not necessary to review those contracts, since MMEU's claim for breach of contract is limited to the allegation that the generators did not comply with MMEU's RFPs.

states that "[t]his RFP is for two additional 1,800 KW Generac SD2000 standby rated engine-generator sets."[10]

Both RFPs required that the generators "be designed, tested, rated, assembled and installed in strict accordance with all applicable ANSI, NEC, ISO, U.L., IEEE and NEMA." The ISO in effect when the contracts were executed was issued in 1993. It provided that "[t]he generating set manufacturer shall be responsible for determining the power output" in accordance with the definitions provided for "continuous power," "prime power," and "limited-time running power."[11] The term "standby" is not found in the 1993 ISO. Accordingly, MMEU does not claim that the generators failed to comply with the applicable ISO.

The ISO was amended in 2005. The 2005 ISO added a definition for "emergency standby power."

> Emergency standby power is defined as the maximum power available during a variable electrical power sequence, under the stated operating conditions, for which a generating set is capable of delivering in the event of a utility power outage or under test conditions for up to 200 h of operation per year with

---

[10] The apparent discrepancy between the 2000 RFP and 2001 RFP is not fully explained in the record. The Court notes, however, that the catalog for the Generac SD2000 lists a "Standby Power Rating" of 2000 kW, and a "Prime Power Rating" of 1800 kW. *See* MMEU's Appendix in support of its resistance to Generac's motion for summary judgment at 125.

[11] The 1993 ISO defined "continuous power" as that which a generating set "is capable of delivering continuously for an unlimited number of hours per year." "Prime power" is defined as "the maximum power available during a variable power sequence, which may be run for an unlimited number of hours per year," but that "[t]he permissible average power output during a 24 h period shall not exceed some percentage of the prime power to be stated by the RIC engine manufacturer." "Limited-time running power" is defined as "the maximum power which a generating set is capable of delivering for up to 500 h per year of which a maximum of 300 h is continuous running." None of the definitions are relevant here.

the maintenance intervals and procedures being carried out as prescribed by the manufacturers.

The permissible average power output over 24 h of operation shall not exceed 70% of the [emergency standby power] unless otherwise agreed by the RIC engine manufacturer.

The actual average power output shall be below or equal to the permissible average power output defined for [emergency standby power].

When determining the actual average power output of a variable power sequence, powers of less than 30% of the [emergency standby power] shall be taken as 30% and time at standstill shall not be counted.

*See* ISO 8528-1:2005(e), ¶ 13.3.4 (Generac's Appendix at 35).

MMEU concedes that the terms "standby," "standby power," or "standby rating" are not defined in the 2000 RFP, the 2001 RFP, or the 1993 ISO, which was in effect at the time the contracts were executed. MMEU asserts, however, that at the time the contracts were executed, "the common understanding in the utility industry was that diesel generators were expected to run at their maximum standby rating for 200 hours per year." Louie Ervin, MMEU's consultant, will testify that the term "standby," as used in the RFPs, required the units to be capable of operating up to 200 hours per year at full power.

Generac denies that there was such a "common understanding" in 2000. However, Generac's expert, Christopher Turner, testified that the definition for emergency standby power included in the 2005 ISO was a codification of the standard which existed in the industry. That definition refers to the power which a generating set "is capable of delivering in the event of a utility power outage or under test conditions for up to 200 h of operation per year." Even if the 2005 ISO limits the "permissible average power output" over a 24-hour period to 70% of the maximum rating, it would still appear that the ISO would allow the generator to be operated at full power for more than 25 hours per

year – the limit now placed on these generators by Generac. Don Vanderbrook, the project engineer for Generac, stated in an e-mail to Mitsubishi:

> Stand by [*sic*] is 100 hours per year max at full load. Again, not a reach and your 25 hours per year at full load is not acceptable! We will get laughed out of the market.

*See* MMEU's Appendix in support of resistance to Generac's motion for summary judgment at 246. Similarly, Joel DeWall, a service manager in Generac's member service/warranty group, sent an e-mail to Doug Owen at MMEU stating that Generac was "working to get you what you have paid for – 7,300 kW (4-1,825 kW) for up to 200 hours per year." *See* MMEU's Appendix in support of resistance to Generac's motion for summary judgment at 274.

In summary, while the ISO in effect at the time the contracts were executed did not define the number of hours which a "standby" generator set was expected to operate annually, and the RFPs themselves did not include such specifications, there is nonetheless a genuine issue of material fact regarding whether the standard in the industry at the time required "standby" generators to be capable of operating at full power for up to 200 hours per year. Generac concedes that the units supplied in satisfaction of the RFPs do not have that capability. Therefore, viewing the evidence in the light most favorable to MMEU, there is a genuine issue of material fact regarding whether the Generac units complied with the RFPs. Accordingly, the Court finds that Generac is not entitled to summary dismissal of MMEU's contract claim.

### B. Breach of Express Warranty

Next, MMEU asserts that Generac has breached its express warranty on these four units. As part of this transaction, Generac issued a "7-year limited extended warranty for standby power systems." The warranty provides that it applies "only to Generac Power Systems Generators used in 'standby' applications, as Generac Power Systems, Inc. have defined Standby." The definition of "standby" is not found in the warranty, but a footnote in Generac's catalog regarding the SD2000 states: "Rating definitions – Standby:

Applicable for supplying emergency power for the duration of the utility power outage." *See* MMEU's Resistance Appendix at 126. The warranty specifically provides that it does not apply to units "used for 'Prime Power' applications as Generac Power Systems have defined Prime Power."

Pursuant to the terms of the warranty, Generac agrees to repair or replace defective parts, pursuant to a "warranty schedule." It is apparently undisputed that Generac fully performed under the warranty following the discovery of "scoring of the pistons and scuffing of the cylinders" in 2005 and "a fire in the turbo" in another unit in 2006. Repairs were performed on-site in Maquoketa, at no expense to MMEU.

In addition, the warranty explicitly disclaims any liability for incidental or consequential damages.

> GENERAC POWER SYSTEMS ONLY LIABILITY SHALL
> BE THE REPAIR OR REPLACEMENT OF PART(S) AS
> STATED ABOVE. IN NO EVENT SHALL GENERAC
> POWER SYSTEMS BE LIABLE FOR ANY INCIDENTAL,
> OR CONSEQUENTIAL DAMAGES, EVEN IF SUCH
> DAMAGES ARE A DIRECT RESULT OF GENERAC
> POWER SYSTEMS, INC. NEGLIGENCE.

*See* Generac Power Systems 7-Year Limited Extended Warranty for Standby Power Systems (MMEU's Resistance Appendix at 123) (all caps in original). Among other things, Generac argues that MMEU's claim for breach of warranty should be summarily dismissed, because its alleged damages fall within the exclusion found in the warranty, or are otherwise based on speculation.

Generally, incidental and consequential damages are recoverable for a breach of warranty if "the seller had reason to know at the time of contracting of the buyer's possible losses caused by a breach." *Nachazel v. Miraco Mfg.*, 432 N.W.2d 158, 160 (Iowa 1988) (citing Iowa Code §§ 554.2714(3) and 554.2715(2)(a)). However, "[c]onsequential damages may be limited or excluded unless the limitation or exclusion is unconscionable." Iowa Code § 554.2719(3). The Eighth Circuit Court of Appeals has recognized that "[t]he

U.C.C. encourages negotiated agreements in commercial transactions, including warranties and limitations." *Transport Corp. of America, Inc. v. International Business Machines Corp., Inc.*, 30 F.3d 953, 959-60 (8th Cir. 1994).

> "It is at the time of contract formation that experienced parties define the product, identify the risks, and negotiate a price of the goods that reflects the relative benefits and risks to each." [citation omitted] An exclusion of consequential damages set forth in advance in a commercial agreement between experienced business parties represents a bargained-for allocation of risk and is conscionable as a matter of law.

*Transport Corp.*, 30 F.3d at 960.

A determination of whether a disclaimer of consequential damages is unconscionable is a question of law for the court. *Bruce v. ICI Americas, Inc.*, 933 F. Supp. 781, 792 (S.D. Iowa 1996) (citing Iowa Code § 554.2302). In determining whether a disclaimer is unconscionable, the court should consider the factors of "assent, unfair surprise, notice, disparity of bargaining power, and substantive unfairness." *Id.* (citing *Gentile v. Allied Energy Products, Inc.*, 479 N.W.2d 607, 609 (Iowa App. 1991) (in turn citing *C&J Fertilizer v. Allied Mut. Ins. Co.*, 227 N.W.2d 169, 181 (Iowa 1975)). "A bargain is unconscionable if it is 'such as no man in his senses and not under delusion would make on the one hand, and as no honest and fair man would accept on the other.'" *Id.* (quoting *Lakeside Boating and Bathing, Inc. v. State*, 402 N.W.2d 419, 422 (Iowa 1987)).

Here, the dispute involves a commercial transaction between sophisticated parties. It is not surprising that Generac wished to protect itself against consequential damages which could potentially flow from a defect in one of their generators. The disclaimer was conspicuously displayed on the warranty, and was not objected to by MMEU. Under these circumstances, the Court concludes that MMEU's claim of incidental and consequential damages flowing from the alleged breach of warranty are excluded as a consequence of the disclaimer.

Alternatively, the Court concludes that MMEU has failed to generate a genuine issue of material fact regarding its claim for breach of warranty. Generac agreed to repair or replace any parts which were found to be defective under normal use and service. In fact, certain repairs were performed pursuant to the warranty. MMEU claims, however, that the generator units were defective because they are unable to operate at full power for up to 200 hours per year. The Court believes this claim is beyond the scope of the express warranty, which calls upon Generac to repair or replace defective parts. For these reasons, the Court concludes that MMEU's second claim for relief should be dismissed.[12]

## C. Breach of an Implied Warranty of Fitness for a Particular Purpose

MMEU asks that it be awarded summary judgment on the liability portion of its third claim for relief – breach of implied warranty of fitness for a particular purpose. MMEU asserts that Generac knew MMEU's intended purpose for the generators, knew that MMEU was relying on Generac's skill in furnishing appropriate equipment, and that MMEU relied on Generac's judgment in that regard. In response, Generac argues that MMEU's claim is barred by the statute of limitations, any implied warranty was disclaimed by Generac, and that the facts do not support a summary finding of breach of implied warranty. Furthermore, Generac asserts that MMEU cannot prove any consequential damages resulting from the alleged breach of implied warranty.

It is undisputed that a five-year statute of limitations governs actions for breach of implied warranty. *See* Iowa Code § 614.1(4); *Richards v. Midland Brick Sales Co., Inc.*, 551 N.W.2d 649, 652 (Iowa App. 1996) (citing *Fell v. Kewanee Farm Equipment Co.*, 457 N.W.2d 911, 919 (Iowa 1990)). Generally, the limitations period begins to run when the goods are delivered. *Id.* "Actions for breach of implied warranty accrue when delivery is made, regardless of the lack of knowledge of the breach." *Richards*, 551 N.W.2d at 652. *See also* Iowa Code § 554.2725(2).

---

[12] The Court finds it unnecessary to address Generac's additional argument that the warranty was voided by MMEU's excessive use of the units.

Here, all four Generac generators were installed not later than April 17, 2002. The limitation period began to run at that time and, generally, an action for breach of an implied warranty of fitness for a particular purpose is barred if not filed by April 17, 2007. This case was not filed until September 16, 2009. MMEU argues, however, that "the doctrines of fraudulent concealment and equitable estoppel work together to estop Generac from asserting its statute of limitations defense and/or to toll the commencement of the applicable statutory limitations period such that the limitations period had not yet run at the time that Plaintiff's Petition was filed."[13]

The effect of fraudulent concealment on a statute of limitations was discussed at length in *Christy v. Miulli*, 692 N.W.2d 694 (Iowa 2005). The Court confirmed that the doctrine of fraudulent concealment is a form of equitable estoppel. As such, "fraudulent concealment does not affect the running of the statutory limitations period; rather, it estops a defendant from raising a statute-of-limitations defense." *Id.* at 701. Accordingly, the issue in this case is whether Generac is estopped from asserting the statute of limitations, which would otherwise bar MMEU's implied warranty claim as untimely. MMEU bears the burden of proving equitable estoppel by a clear and convincing preponderance of the evidence. *Id.* at 702.

> The foundational elements of equitable estoppel are well established:
> (1) The defendant has made a false representation or has concealed material facts;
> (2) the plaintiff lacks knowledge of the true facts;
> (3) the defendant intended the plaintiff to act upon such representations; and
> (4) the plaintiff did in fact rely upon such representations to his prejudice.

---

[13] *See* MMEU's Brief in Reply to Generac's Motion for Summary Judgment (docket number 35) at 3.

*Christy*, 692 N.W.2d at 702 (quoting *Meier v. Alfa-Laval, Inc.*, 454 N.W.2d 576, 578-79 (Iowa 1990)).

To estop Generac from asserting the barment resulting from application of the statute of limitations, MMEU must prove by clear and convincing evidence that Generac "did some affirmative act to conceal the plaintiff's cause of action *independent of and subsequent to* the liability-producing conduct." *Christy*, 692 N.W.2d at 702. (emphasis added) "To establish false representation or concealment, there must be evidence the party acted 'with the intent to mislead the injured party.'" *Boehme v. Fareway Stores, Inc.*, 762 N.W.2d 142, 147 (Iowa 2009). That is, "[e]quitable estoppel is a limited doctrine that applies only when a 'defendant takes active steps to prevent the plaintiff from suing on time.'" *Bensman v. United States Forest Service*, 408 F.3d 945, 965 (7th Cir. 2005) (cited with approval in *Hook v. Lippolt*, 755 N.W.2d 514, 525 (Iowa 2008)). Furthermore, equitable estoppel requires a showing that the defendant "engaged in affirmative misconduct rather than mere negligence." *Bensman*, 408 F.3d at 965; *Hook*, 755 N.W.2d at 525.

Here, MMEU contends that "Generac knew that MMEU intended to operate the Units at or about 1800 kW for eight to twelve hours at a time for up to 200 hours per year," that "Generac also knew that the Mitsubishi Power Rating Guidelines precluded the Units from being operated at such a level," and – most importantly to MMEU's claim of fraudulent concealment – that "Generac falsely represented to MMEU that the Units could be operated at such a level and purposefully concealed the contrary Mitsubishi Power Rating Guidelines from MMEU."[14] In support of its allegations, MMEU cites paragraphs 31-40 and 52-55 of its statement of additional material facts.[15]

---

[14] *See* MMEU's Brief in Support of Resistance to Generac's Motion for Summary Judgment (docket number 33) at 22.

[15] In resisting Generac's motion for summary judgment, MMEU unhelpfully filed (continued...)

After carefully reviewing MMEU's citations to the record, the Court concludes that they do not support a finding that Generac did some affirmative act to conceal MMEU's alleged cause of action for breach of an implied warranty of fitness for a particular purpose, which was "independent of and subsequent to the liability-producing conduct." *Christy*, 692 N.W.2d at 702. Even viewing the evidence in the light most favorable to MMEU, the record does not support a finding that Generac took some affirmative action "to prevent the plaintiff from suing on time." In fact, the evidence suggests that MMEU was notified by Generac not later than May 16, 2006 – well before the statute of limitations had run on a breach of implied warranty claim – that "the engines are rated at too high of a rating and the rating needs to be lowered." According to the minutes of a board meeting, "[d]iscussion was held on what the potential exposure, or penalty, would be for the Utility not being able to dedicate to RPGI what they had promised them."[16] At its July 11, 2006 meeting, MMEU's board of trustees held a discussion "regarding lowering the ratings on the Generac engines because we cannot run them as hard as we thought."

In summary, the statute of limitations on MMEU's claim of breach of an implied warranty of fitness for a particular purpose ran not later than April 2007. The petition was

---

[15](...continued)
a second appendix containing many of the items included in its appendix filed in support of MMEU's motion for summary judgment, but with the pagination changed. In other words, page 203 of MMEU's appendix in support of its motion for summary judgment is identical to page 234 of MMEU's appendix in resistance to Generac's motion for summary judgment. This duplication, particularly with the change in numbering, has made the Court's task more time-consuming and more difficult. The problem is illustrated by Generac's response to paragraph 31 of MMEU's statement of additional material facts, where the parties refer to precisely the same testimony, but MMEU refers to the pagination found in its appendix in resistance to Generac's motion, while Generac refers to the pagination found in MMEU's appendix in support of its motion for summary judgment.

[16] *See* MMEU's Resistance Appendix at 272.

not filed until September 2009. MMEU has failed to generate a genuine issue of material fact in support of its claim that Generac fraudulently concealed facts, thereby preventing MMEU from suing on time. Accordingly, the Court finds that MMEU's third claim is time-barred and must be dismissed.[17]

### D. Breach of Limited Warranty

Finally, MMEU claims that it is entitled to relief for breach of Generac's limited warranty. For the reasons set forth in Part VI(B) above, the Court concludes that MMEU's claim of breach of limited warranty fails as a matter of law. Accordingly, MMEU's fourth claim will be dismissed.

### VII. SUMMARY

In summary, the Court concludes that there are genuine issues of material fact regarding MMEU's claim of breach of contract, thereby precluding summary judgment. The Court further concludes, however, that MMEU's breach of warranty claims should be dismissed, for the reasons set forth above. This matter will proceed to trial on MMEU's claim of breach of contract and Generac's counterclaim.

### VIII. ORDER

IT IS THEREFORE ORDERED as follows:

1.     The Motion for Summary Judgment (docket number 30) filed by MMEU is **DENIED**.

2.     The Motion for Summary Judgment (docket number 31) filed by Generac is **GRANTED** in part and **DENIED** in part, as set forth above.

3.     As previously scheduled, this matter will proceed to trial on March 14, 2011 on MMEU's claim of breach of contract and Generac's counterclaim.

---

[17] Having concluded that MMEU's claim of breach of implied warranty is time-barred, the Court finds it unnecessary to consider Generac's additional arguments that any implied warranty was disclaimed, the facts do not support an implied warranty, or that MMEU was not damaged in this regard.

4. The parties are reminded of the telephonic final pretrial conference scheduled on **February 25, 2011 at 9:00 a.m.** As previously ordered, the parties' proposed final pretrial order is due not later than **February 18, 2011**. *See* docket number 19.

DATED this 15th day of February, 2011.

JON STUART SCOLES
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA